# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Angela K., | Case No. 22-cv-02182 (JRT/ECW) |
| Plaintiff, | |
| v. | **CORRECTED REPORT AND RECOMMENDATION** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

This matter is before the Court on Plaintiff Angela K.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 12) and Defendant's Motion for Summary Judgment (Dkt. 15). Plaintiff filed this case seeking judicial review of a final decision by Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, ("Defendant" or "the Commissioner") denying her application for disability insurance and supplemental income benefits. This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's Motion be granted in part, Defendant's Motion be denied, and that this case be remanded to the Commissioner consistent with this Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

On October 31, 2018, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income under Titles II and XVI of the Social Security Act,

alleging disability as of June 28, 2018.  (R. 437-44.)[1]  Her claim was initially denied on

June 23, 2019, and her claim was again denied on October 29, 2019 on reconsideration.

(R. 164-83, 208-28.)  On November 15, 2019, Plaintiff filed a written request for hearing

before an administrative law judge.  (R. 304-08.)  Plaintiff appeared via telephone with

legal counsel and testified at a hearing on August 14, 2020 before Administrative Law

Judge Lyle Olson.  (R. 71-105.)

In a decision dated November 5, 2020, Administrative Law Judge ("ALJ") Lyle

Olson concluded that Plaintiff was not disabled. (R. 254-276.)  Plaintiff filed a request for

review with the Appeals Council on November 12, 2020.  (R. 68-70.)  On April 26, 2021,

the Appeals Council remanded with instructions for the administrative law judge to

obtain specified additional evidence and Plaintiff had a subsequent video hearing on

August 10, 2021 before ALJ Christel Ambuehl.  (R. 106-63.)

The ALJ issued another unfavorable decision on November 30, 2021, finding that

Plaintiff was not disabled.  (R. 14-31.)

Following the five-step sequential evaluation process under 20 C.F.R.

§ 404.1520(a) and § 416.920(a),[2] the ALJ first determined at step one that Plaintiff had

---

[1]    The Administrative Record ("R.") can be found at Docket Entry No. 9.

[2]    The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the
claimant is presently engaged in a substantial gainful activity; (2) whether
the claimant has a severe impairment that significantly limits the claimant's
physical or mental ability to perform basic work activities; (3) whether the
claimant has an impairment that meets or equals a presumptively disabling
impairment listed in the regulations; (4) whether the claimant has the residual

not engaged in substantial gainful activity during the period from the alleged onset date of June 28, 2018, and met the insured status requirements of the Social Security Act through September 30, 2021.  (R. 17.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease (status post discectomy (2014) with lumbar spondylosis; neurocardiogenic syncope (status post pacemaker implantation); post-concussive headaches/migraines; occipital neuralgia; mixed type femoroacetabular impingement, right hip; neurocognitive disorder; major depressive disorder, mild; mood disorder; bipolar disorder; generalized anxiety disorder; ADHD; borderline personality disorder; posttraumatic stress disorder; and sick sinus syndrome.  (R. 17.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 19-23.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and occasionally push or pull within the limitations in lifting and carrying. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally

---

functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

balance (as the term is defined in SCO [Selected Characteristics of Occupations]), stoop, kneel, crouch, and crawl. The claimant is limited to occasional overhead reaching. The claimant is limited to occasional exposure to extreme cold, wetness, and vibration. The claimant would need to avoid working in environments where she is exposed to loud or very loud background noise (as the term is defined in SCO). The claimant is limited to no exposure to unprotected heights or dangerous equipment, and no driving as part of work. The claimant is able to understand, remember, and carry out with acceptable pace and persistence simple, routine tasks in a routine work environment (simple are those that can be learned in 30 days). The claimant is able to adapt to changes in a routine work setting and follow employer set goals. The claimant can work at a goal orientated pace throughout the workday but not at a production rate pace in an industrial setting where tasks must be completed within very short time deadlines.

(R. 23.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that given Plaintiff's age, education, work experience, and RFC, there were other jobs that exist in significant numbers in the national economy that she could perform, including work as an: office helper (DOT code 239.567-010; unskilled, SVP 2; light); motel cleaner (DOT code 323.687-014; unskilled, SVP 2; light); and counter attendant (DOT code 311.477-014; unskilled, SVP 2; light).  (Dkt. 30.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 31.)

Plaintiff requested review of the decision and submitted various medical records directly to the Appeals Council.  (R. 40-68.)  With respect to these medical records, the Appeals Council stated, "You submitted additional evidence from Mayo Clinic Health System dated November 22-24, 2021 (28 pages).  We find this evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not

exhibit this evidence."  (R. 2.)  The Appeals Council accordingly denied further review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3.)

Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

On July 10, 2018, Plaintiff admitted to being addicted to drugs and that she had suffered a seizure sometime in the past when detoxing.  (R. 763.)

On September 4, 2018, Plaintiff was seen at the emergency department relating to a fall, involving a loss of consciousness, which resulted in her hitting the back of her head on a table.  (R. 1240.)  Her family stated that they believed that she had a seizure when she fell.  (R. 1240.)

On September 5, 2018, Plaintiff was seen at the emergency room with complaints of a post-concussion headache, vertigo, and nausea.  (R. 682.)  Plaintiff reported that she was seen in Detroit Lakes Hospital on Monday, September 3, 2018 for two seizures, asserting that she fell and hit her head resulting in a concussion.  (R. 682.)  Plaintiff claimed the reason for her seizure was that her potassium level was "extremely low" and that they treated her and told her to return if she had any of her current symptoms.  (R. 682.)  Her CT scan at the first hospital visit was unremarkable.  (R. 682, 1245.)  Dr. Fahd

Arafat, M.D., found as follows: "Exam is benign. Symptoms seem to be common postconcussion." (R. 685.)

During a September 12, 2018 follow-up, Plaintiff asserted that her significant other claimed that she had a seizure with her fall on September 3 and was seen at the emergency room on September 4, but denied any further seizure activity. (R. 741.) A neurology consult was scheduled based on the "Witnessed seizure-like activity." (R. 742.)

On September 13, 2018, Plaintiff was seen for a consultation with neurology regarding her seizures, as a result of the recent loss of consciousness. (R. 737.) Plaintiff asserted that on September 4, 2018, she was at home, cutting a pizza, and then felt like she was going to pass out and fell to the ground with some sort of convulsive activity and foaming at the mouth. (R. 737, 740.) She had no warning symptoms, save for feeling like she was going to pass out. (R. 740.) She experienced no loss of bowel or bladder control and did not bite her tongue. (R. 740.) She did admit to taking two trazadone[3] pills from her husband, but that she had also done so in the past with no problems. (R. 740.) She had no focal neurologic symptoms, such as focal weakness, numbness, or incoordination. (R. 740.) Since then, she reported having word finding difficulties, memory problems, severe neck pain, and persistent headache. (R. 740.) An MRI was taken, which was normal and "no etiology for seizure-like activity identified." (R. 740, 810, 1245.) The impression given for Plaintiff was syncope, concussion with word

---

[3]     Trazadone is an antidepressant. *See* THE PILL BOOK, 1168 (15th ed. 2012).

finding difficulties, memory changes, neck pain, and a new persistent headache.  (R. 740.)  The impression for Plaintiff also included "Question seizure."  (R. 740.)  Electroencephalogram[4] ("EEG") results were pending at that time, and given the concern regarding a syncopal event, an electrocardiogram and a transthoracic echocardiogram were to be obtained, and a cardiology consult was to be scheduled.  (R. 740.)

On January 16, 2019, Plaintiff called stating that her dentist needed approval for her dental work given her past seizure and on January 18, 2019, her medical provider responded, "We have no evidence for a seizure disorder."  (R. 993.)

On April 1, 2019, Plaintiff was seen for her ears and sinuses and it was noted that she had passed out in September due to an unknown cause.  (R. 1297.)  The treatment note provided that the MRI, CT, and EEG were negative.  (R. 1297.)

On May 20 through 22, 2019, Plaintiff was tested with an ambulatory EEG to capture spells.  (R. 1400.)  Despite Plaintiff's claims of "spells" during the testing, the results were as follows: "This is a normal awake and asleep 48-hour ambulatory EEG. Spells reported by patient were not associated with epileptiform EEG change-these are nonepileptic events.  No seizures or epileptiform discharges were recorded."  (R. 1401.)

---

[4]     "An electroencephalogram (EEG) is a test that measures electrical activity in the brain using small, metal discs (electrodes) attached to the scalp. Brain cells communicate via electrical impulses and are active all the time, even during asleep. This activity shows up as wavy lines on an EEG recording. An EEG is one of the main diagnostic tests for epilepsy. An EEG can also play a role in diagnosing other brain disorders."  *Mayo Clinic,Tests & Procedures: EEG (electroencephalogram*, https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875 (last visited July 19, 2023).

On July 3, 2019, Plaintiff reported that there was a fire outside her house, and that she then proceeded to have a "grand mal seizure." (R. 1377.) She claimed that the next day, she felt like she was "out of my body," but that she felt better but more fidgety, and had been struggling with anxiety and depression. (R. 1377.) She asserted that her seizure was witnessed by an emergency medical technician. (R. 1378.) She was to be seen by neurology. (R. 1378.)

On July 22, 2019, Plaintiff was seen for her chronic migraine. (R. 1372.) It was noted that an EEG was obtained in September 2018, which did not reveal any epileptiform activity. (R. 1372.)

On September 17, 2019, Plaintiff was brought in by ambulance to the emergency department after she had seizure-like activity while she was trying to cook. (R. 1420.) She was found sitting up in a corner slumped against the wall and it was suspected that she hit her head on the back of a stove. (R. 1420.) It was unknown how long the seizure lasted, however, her family claimed that it was less than 30 seconds. (R. 1420.) Plaintiff underwent an electromyography and a computed tomography ("CT") scan of the head, both of which showed no acute findings. (R. 1423-24.) It was noted that Plaintiff had low potassium and that she had seizure-like activity, which needed a workup. (R. 1423-24.)

On September 19, 2019, Plaintiff was seen for follow-up. (R. 1477.) She claimed to have three seizures and falls caused by stress, too much activity, a lack of sleep, and low potassium levels, but that her neurology providers did not believe she has suffered

from an actual seizure, and therefore she was not on any medications for her seizures. (R. 1477.)

On March 2, 2020, Plaintiff presented to the emergency department for possible seizure-like activity. (R. 1752.) Plaintiff's significant other reported that they were watching television when Plaintiff tensed up and experienced a small amount of trembling that resolved in 30-45 seconds, with drowsiness lasting for approximately 5-10 minutes thereafter, but was alert and oriented by the time she arrived at the emergency department. (R. 1752.) Plaintiff was not on any anti-seizure medication. (R. 1752.) It was noted that Plaintiff had heart palpitations throughout the day. (R. 1752.) Plaintiff's "presentation did appear consistent with a pseudoseizure given there was no postictal phase is noted [sic] however given the patient's significant past cardiac history we'll obtain cardiac laboratory studies to rule out arrhythmia/ACS as possible cause of the patient's symptoms." (R. 1757.) It was noted that Plaintiff had undergone a 48-hour EEG in May of 2019 that did not show any epileptiform changes. (R. 1756.) It was recommended by a neurologist that she follow up in June 2019, but she never did. (R. 1757.) Providers could not find an identifiable cause for her possible seizure-like activity. (R. 1757.)

On March 11, 2020, Plaintiff sought a note from her provider saying she could go back to work:

> Angela has been off work for about a week after a generalized seizure. It may have been a pseudoseizure. She was seen in the ED. She has had a neurology workup in the past and had EEGs, ambulatory EEG, etc and no seizures were found. She is not on any anticonvulsants. She will be getting another opinion

with Dr. Ragland soon. She is feeling better and needs a note that she can return to work.

(R. 1838.) It was also noted that she had been having problems with heart rhythm, and that she already had a pacemaker due to episodes of asystole. (R. 1383.)

On March 16, 2020, Plaintiff was seen at an emergency room for chest pain and was concerned that it was precursor for a seizure. (R. 1738.) Plaintiff represented that she had not had any recent seizures and it was noted that she had normal EEGs. (R. 1738.)

On June 2, 2020, Plaintiff reported that she had been taking a medication that she claimed caused her to have seizures every day. (R. 1690-91.) She also stated that her seizure episodes were random in that she could have none for weeks or a few day; that she experienced more seizures the more active she was; that heat and humidity made it worse; that she could feel them coming; they felt like an out of body experience; and that she would sit or lie down when this happened, with no injury. (R. 1690-91.)

On June 18, 2020, Plaintiff had a neurology consultation regarding her complaints of seizures. (R. 1866.) Plaintiff reported that her seizure frequency would be 2 to 4 a month over a period of two years and that she had suffered, at some points in the past, 2 to 4 seizures a day. (R. 1866.) She had never been treated with anticonvulsants. (R. 1866.) The impression by the neurologist for Plaintiff was as follows:

> [A]ppears to have "a seizure disorder'' which is in some way convincing and other ways not in favor. For example; foaming at the mouth is a strong indicator that she could have had seizures, gasping for air and biting the lip is a possibility, but then there is no lateral tongue biting or bladder incontinence. She stated duration of most of the seizures are within a span of 60 seconds. She did not mention about tonic-clonic movements. In any case,

10

> we will give her the benefit of the doubt and we will do a repeat EEG initially and if it is negative we will go into a sleep-deprived EEG.

(R. 1868.)  The position of Plaintiff's pacemaker was also going to be examined via a CT scan.  (R. 1868.)  Seizure precautions were advised.  (R. 1868.)  The follow-up EEG was normal in the awake, drowsy, and sleep states. (R. 1873.)  A July 27, 2020 EEG was also normal in the awake, drowsy, and sleep states. (R. 1877.)  An August 3, 2020 neurology follow-up note provided that the testing and EEG results were normal and the provider opined as follows:

> 2.   Her routine EEG dated 6/30/2020 revealed no clear evidence of epileptiform discharges. During the episode on the video monitoring the patient was noted to have mild shaking of the head, arching of the head with retrocollis as well as opisthotonus-like arching of the upper back. There was no corresponding spike focus or electrographic seizure activity except for some muscle artifacts. Therefore, I concluded there was no clear cut epileptiform discharges or electrographic seizureactivity corresponding to her motor manifestations.

> 3. This was followed by a sleep deprived EEG dated 7/27/2020, and again she exhibited photic response on two separate occasions, one at 10 Hz and then at 12 Hz, strobe light frequencies. The patient appeared to be "unresponsive" for about 1 minute and on the second occasion her head started arching back (retrocollis) and the back was also arching a little bit resembling opisthotonus. Later on after these episodes the patient recalled every moment that happened to her at the time indicating this was not true epileptiform abnormalities but rather extracerebral manifestations. This could well be non-epileptic psychogenic seizure episode.

(R. 1880.)  The neurologist was not convinced that these were true seizure episodes.  (R. 1880.)  The plan was for a long-term EEG study.  (R. 1883.)

On August 25, 2020, Plaintiff presented to the emergency department with a complaint of seizures.  (R. 1700.)  It was noted that Plaintiff had a history of prolonged sinus pauses and paroxysmal supraventricular tachycardia status post-pacemaker,

suspected neurocardiogenic syncope, possible seizure disorder, bipolar disorder, generalized anxiety disorder, hypokalemia, and post-traumatic stress disorder ("PTSD"). (R. 1700.)  The frequency of the seizures was quite variable, as were the nature of the seizures themselves, including some seizures that involved her staring off into space, and other times involving full body tonic-clonic type seizures, lasting anywhere from 20 seconds to a minute.  (R. 1700.)  She claimed that she felt disoriented after the seizures were over, but did not necessarily have a postictal period of unresponsiveness.  (R. 1700.) Recently, she claimed to be having more frequent episodes, with almost daily episodes over the previous week, and that she had experienced 10 episodes on the day of the appointment.  (R. 1700.).  Plaintiff asserted that these episodes tended to be more frequent when it was hot outside, but were also provoked by stress/anxiety.  (R. 1700.) She had an EEG on June 30 that did not show any epileptiform activity.  (R. 1700.)  She subsequently had a sleep-deprived EEG on July 27, 2020 that likewise did not show any epileptiform activity. (R. 1700.)  She had a CT scan of the head on July 28, 2020 that also did not show any acute abnormalities.  (R. 1700.)  It was noted that her neurologist believed that Plaintiff's seizures were likely psychogenic nonepileptic seizures (pseudoseizures).  (R. 1700.)  Patient was not on any antiepileptic medications.  (R. 1700.)  It was noted that Plaintiff had no focal motor deficits and no focal sensory deficits.  (R. 1701.)  Blood tests were normal.  (R. 1704.)  Plaintiff's husband claimed that she experienced a seizure while in the hospital. (R. 1703.)  Her attending doctor also witnessed one of these episodes, lasting less than 30 seconds, where Plaintiff started to hold her breath, tensed up, and her eyes clenched closed.  (R. 1703-04.)  She quickly

woke up after the episode and was not disoriented on examination, but had a headache.

(R. 1704.)  Doctors found that the "episode does not have a typical appearance of a

generalized tonic-clonic seizure.  This and the appearance of this episode alone, with the

absence of any postictal state, this certainly seems more likely to be a psychogenic

nonepileptic/pseudoseizure."  (R. 1704.)  Plaintiff chose to leave the hospital.  (R. 1704.)

The opinion on discharge was as follows:

> Earlier during her visit, we did have a discussion about antiepileptic
> medications and I advised that given her upcoming EEG and the fact that she
> is following so closely with a neurologist, she was agreeable that we should
> not start an antiepileptic medication at this time. Given her previously
> unremarkable EEGs, with normal diagnostic workup tonight, and witnessed
> event this evening by me in the ER that does not have a typical appearance
> for generalized tonic-clonic seizure and is more likely to be a psychogenic
> nonepileptic seizure/pseudoseizure, I do think that follow-up with her
> neurologist and scheduled EEG is reasonable. She was in stable condition at
> time of discharge.

(R. 1704.)

On September 23, 2020, Plaintiff was again seen at the emergency department

with a complaint of a seizure.  (R. 1891.)  Plaintiff reported standing outside with a

relative when she had a decreased level of consciousness.  (R. 1891.)  It was unknown if

this was a true seizure or a syncopal episode when she fell backwards and struck the back

of her head on the ground.  (R. 1891.)  She had some twitching with her hands, but no

obvious large tonic/clonic seizure like activity.  (R. 1891.)  She was difficult to arouse

and had some lightheadedness with lateral eye movement.  (R. 1891.)  On arrival, she had

pain in the back of her head and a large laceration.  (R. 1891.)  CT imaging was normal.

(R. 1908.)

December 7, 2020, January 19, 2021, February 2, 2021, and May 7, 2021 progress notes indicate that Plaintiff represented that her last seizure occurred on September 23, 2020.  (R. 1935, 2031, 2129, 2142.)

On December 10, 2020, it was noted during a psychiatric appointment that Plaintiff had been diagnosed with a seizure disorder and was taking Keppra[5] for the condition.  (R. 1938.)

In a January 2021, progress note, Plaintiff represented that she had been started on Keppra for her seizures on October 9, 2020, which Plaintiff claimed "had made a world of difference," noting that prior to the medication she was having 1 to 10 seizures a day, and that since taking the medication she only had one where her eyes fluttered for 5 seconds, but she was fully aware of her surroundings while sitting in a chair.  (R. 2070, 2073.)

During a February 2, 2021 appointment, Plaintiff represented that if she goes at a faster physical pace, she needs to sit down, otherwise she gets a "pseudo seizure."  (R. 2135.)  Plaintiff represented that her last seizure had occurred in September 2020.

On April 30, 2021, Plaintiff was seen at the emergency department for evaluation of a several-week history of chest pain and increased seizure-like activity.  (R. 2082.) Immediately after the initial examination and the provider left, Plaintiff's significant other (who was at Plaintiff's bedside) activated the call light to inform nurses that Plaintiff was experiencing a seizure.  (R. 2082.)  Plaintiff was noted to be posturing in a

---

[5]     Keppra is an antiepileptic medication.  THE PILL BOOK, 684 (15th ed. 2012).

completely extended position from head to toe, exhibiting some mild tremulous movements throughout. (R. 2082.) Upon calling out Plaintiff's name, the activity continued, however, she was noted to open her eyes and make eye contact with individual speaking in the room. (R. 2082.) During this activity, Plaintiff was actively sobbing and tearful. (R. 2082.) The seizure-like activity lasted for approximately 30 seconds, following which the patient immediately returned to her baseline mental status and was conversant. (R. 2082.) The on-call neurologist was able to review records from previous EEGs and felt that the patient's symptoms were likely nonepileptic seizures. (R. 2083.) It was noted that Plaintiff had just been at a court proceeding related to her being charged with a DUI. (R. 2083.) It was also noted that Plaintiff's Keppra dosage had just been increased. (R. 2078.) Plaintiff was discharged the same day. (R. 2083-84.)

On September 14, 2021, Plaintiff presented to the Mayo Clinic for an evaluation of spells concerning for seizures. (R. 2156.) Plaintiff complained that she had been having 5 to 10 seizures per month. (R. 2162.) Further, during the evaluation by Dr. Osman:

> - Patient had a witnessed episode during the encounter characterized by speech and behavioral arrest, her eyes were deviated to the right and upwards, she laid back down on the examination table and her arms were stiff with eye fluttering. This lasted around 1 minute after which she was back to normal self.

(R. 2159.)

The assessment for Plaintiff included "Spells Neurological (HCC)." (R. 2159.) Plaintiff was to be admitted for spell classification at the Adult Epilepsy Monitoring Unit ("EMU"). (R. 2159, 2162.) Plaintiff also reported significant memory decline since the

initial seizure in 2018, so neuropsychological testing was to be completed.  (R. 2159.)
Plaintiff was also told that she was not allowed to drive for three months after her seizure
event.  (R. 2159.)

B.     **Mayo Clinic Health Records Provided to the Appeals Council**

The November 23, 2021 discharge diagnosis from the Mayo Clinic EMU was
behavioral spells that were not epileptic in nature.  (R. 49, 56.)  To provoke spells,
antiseizure medications were discontinued, and health providers recorded several typical
spells without an EEG correlate, as the providers did not record seizures or epileptiform
activity based on EEG testing.  (R. 50-51, 56, 58-59.)  "The spells that we captured
during this admission are not seizures but rather nonepileptic spells.  The patient will
contact her local psychiatrist to pursue behavioral therapy."  (R. 50.)  It was
recommended that Plaintiff approach management of this disorder through
psychologically based treatment modalities.  (R. 56-57.)

On November 24, 2021, Plaintiff underwent a neuropsychometric evaluation.  (R.
45.)  As part of the evaluation, Plaintiff underwent testing that placed her under the
borderline region of cognitive function, but it was noted that the test results should be
viewed cautiously due to unreliable task engagement by Plaintiff.  (R. 46.)  Testing
showed: nonverbal aptitude was borderline; spatial analysis, organization and integration
was inefficient but intact; WAIS IV processing was low average; WAIS IV working
memory was borderline; and hypothesis testing was poor, but persistence was limited.
(R. 47.)

On November 24, 2021, Plaintiff was seen for a follow-up after EMU admission. (R. 41.)  Plaintiff presented a history of her seizures, including the types and frequency. (R. 41.)  Type 1: Aura (out of the body sensation), nausea, lightheadedness, is aware of the surroundings but she cannot respond.  (R. 41, 52.)  She was noted to moan, grunt and gasp for air, her whole body was stiff like a board with eyes rolling back, intermittent whole jerks, eye fluttering, and foaming at the mouth.  (R. 41, 52.)  These seizures lasted approximately 4 to 5 minutes followed by around 5 minutes of unresponsiveness and a headache.  (R. 41, 52.)  These types of seizures occurred 5 to10 times daily before she started Keppra in September 2020.  (R. 41.)  Since starting Keppra, Plaintiff experienced 5 to 10 of these types of seizures a month, except the month of the examination where she only had 1 episode.  (R. 41.)

Type 2: "Spacing out" spells where her eyes felt fluttery, and she lost track of her surroundings.  (R. 41, 52.)  These types of seizures occurred daily, lasting around 2 to 3 minutes.  (R. 41, 52.)

Type 3 involved dizzy spells that was described as a spinning sensation, with feeling wobbly to the sides.  (R. 41, 52.)  The duration of these seizures was daily, lasting a few seconds up to a minute.  (R. 41.)

According to Plaintiff, seizures were occurring daily to weekly.  (R. 41.)  Plaintiff had been admitted to the EMU from November 22-23, 2021, during which time 7 typical events were captured without an EEG correlate.  (R. 42.)  Neuropsychological testing was completed for memory impairment and Plaintiff demonstrated poor scores in all cognitive domains, likely explained by poor mental effort, which could be attributed to multiple

factors including mood disorder, sleep disturbance, fatigue, and medications. (R. 42.)

Plaintiff was not comfortable stopping her Keppra medication despite medical providers

telling her that her spells were shown to be non-epileptic in nature. (R. 42-43.) The

assessment for Plaintiff was spells undifferentiated and other bipolar disorder. (R. 43.)

The assessment of the non-epileptic behavioral events was as follows:

> Discussed EMU monitoring results which demonstrated a normal EEG with
> severe recorded typical events without EEG correlate consistent with non-
> epileptic behavioral events. We discussed the nature of non-epileptic attacks,
> one of the functional neurological symptom disorders. We discussed that
> these are involuntary and abrupt attacks that are impairing, and that they are
> commonly in the setting of specialty epilepsy evaluations. They are often
> misdiagnosed and treated as epilepsy for years before the correct diagnosis
> is made. This can leave people feeling understandably frustrated and
> confused. While these attacks mimic the seizures caused by epilepsy, the
> EEG during these attacks does not show an electrical seizure of the brain but
> instead looks like the patient's baseline EEG. Although they are not electrical
> seizures, the attacks can be no less disabling, and can result in all of the same
> problems that epileptic seizures do including loss of independence and
> accidental injury. What is most important to know is that these are not "fake."
> These are real, involuntary attacks that pose a significant problem.
>
> We discussed that the mechanisms behind these attacks are complex and not
> well understood. Some patients endorse significant life stressors as a
> potential cause, but many (if not most) do not identify any specific factors
> resulting in these events. Similarly, some patients may have backgrounds that
> include depression, anxiety, or PTSD, but again many patients do not have
> these factors as identified contributors. Regardless, these attacks ultimately
> come about because of impairment between how the mind, brain, and body
> communicate with each other. Because they are not electrical seizures,
> anticonvulsant medications like those used in epilepsy are not helpful for
> treatment. The recommended treatment is through our mental health
> colleagues with therapies that aim to help realign the mind-brain-body
> communication that has gone awry.

(R. 43.)

C.    **Hearings Testimony Before the ALJs**

At the first hearing before an ALJ, Plaintiff described frequent absences from work as a personal care attendant due to seizures or dizziness impacting her availability, but testified that she quit due to the COVID-19 epidemic and her risk factors.  (R. 87-88, 142-43.)

During her second hearing, Plaintiff testified to having 3 grand mal seizures a week since she had started her Keppra the previous September 2020 until she increased her dosage in February 2021, with only 4 to 5 such seizures occurring after the increase in Keppra.  (R. 123-25.)  Plaintiff described the grand mal seizures as not being able to move or talk, and not remembering anything with a great deal of pressure in her head afterwards and being very tired.  (R. 124.)  Sometimes it took her 2 days to get over this type of episode.  (R. 124.)  Plaintiff also described other types of seizures she experienced that she characterized as "little seizures," including having her eyes roll back and shake, but noted that she had more control over herself during these episodes and would have more functioning.  (R. 126-28.)  Those seizures occurred about 1 to 2 times a week.  (R. 135.)  Plaintiff testified that she had no control over her seizures.  (R. 129.)  Plaintiff testified that she drives and had never had a seizure while driving, but will not drive after she experiences a seizure.  (R. 128.)

### III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's

decision results from an error in law.  *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018).  As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence . . . is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Nash*, 907 F.3d at 1089 (marks and citation omitted).  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.*  "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision."  *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.  DISCUSSION

Plaintiff requests reversal and an award of benefits, or remand in the alternative, and sets forth three arguments in support of her request.  She asserts remand is required because (1) the Appeals Council erred by not exhibiting Mayo Clinic records from November 22-24, 2020; (2) the ALJ committed error in failing to find Plaintiff's

nonepileptic neurological disorder impairment severe, which was not harmless; and

(3) the RFC does not account for limitations from Plaintiff's nonepileptic neurological

disorder.  (Dkt. 13 at 12-17.)

A.    **The ALJ's Decision Regarding Plaintiff's Non-Epileptic Seizure at Step Two and the Medical Records Received by the Appeals Council from the Mayo Clinic**

At the second step, the SSA considers "the medical severity of [a claimant's]

impairment(s)."  20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 416.920(a)(4)(ii).  It is a

claimant's burden to demonstrate a severe medically determinable impairment at step two

of the sequential evaluation, but that burden is not difficult to meet and any doubt about

whether the claimant met his burden is resolved in favor of the claimant.  *See Kirby v.*

*Astrue*, 500 F. 3d 705, 707-08 (8th Cir. 2007) (citations omitted).  According to the SSA:

> An "impairment" must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings….

Titles II & XVII: Symptoms, Medically Determinable Physical & Mental Impairments, &

Exertional & Nonexertional Limitations, SSR 96-4P, 1996 WL 374187 at *1 (S.S.A. July

2, 1996).  Further, an impairment is not severe if it does not significantly limit a

claimant's physical or mental ability to do basic work activities.  *See Kirby*, 500 F. 3d at

707; 20 C.F.R. § 404.1520(c); 20 C.F.R. § 416.920(c).  The severity showing "is not an

onerous requirement for the claimant to meet, but it is also not a toothless standard."

*Kirby*, 500 F.3d at 708 (citations omitted).

With respect to step two and Plaintiff's seizures or spells, the ALJ found as follows:

> Concerning the alleged seizure disorder, the record does not contain medical evidence including examination findings and imaging results to establish a medically determinable impairment. At the hearing before the undersigned, the claimant testified she has had four to five grand mal seizures and about 100 small seizures since February 2021, after starting Keppra in September 2020 and an increased dose in February 2021. According to progress notes, the claimant reported her seizures are induced from low potassium levels (Exhibit 18F, page 10; 19F, page11; 23F, page 169). In May 2019, the claimant presented with concerns of low potassium that she felt was contributing to her periods of increased heart rate (Exhibit 16F, page 27). The claimant was advised to continue with her current supplementation for potassium (Exhibit 16F, page 29). In September 2019, the claimant complained of having three seizures and low potassium levels, but neurology did not believe they were "true seizures" (Exhibit 19F, page 11). In March 2020, the claimant was provided with potassium supplementation at an emergency room to treat mildly decreased potassium levels (Exhibit 23F, page 60). The physician assessed "possible seizure-like activity" without any identifiable cause (Exhibit 23F, page 60). At an emergency room visit in June 2020, a physician noted the claimant had "likely" psychogenic nonepileptic/pseudo seizures (Exhibit 23F, page 7). A CT scan did not show any acute abnormality. The claimant was recommended to follow-up with neurology for further evaluation. In August 2020, James Ragland, MD saw the claimant for follow-up after diagnostic examinations, including a CT scan, routine EEG, and sleep deprived EEG (Exhibit 23F, page 183). Based on the objective medical findings, Dr. Ragland was not convinced the claimant was having "true seizure" episodes. Progress notes from January 2021 show the claimant reported only having one seizure after starting Keppra, which was a "big improvement" (Exhibit 25F, page 31; 26F, page 49). Neurology noted the claimant did not require increased dosing of Keppra, as her symptoms were likely nonepileptic seizures (Exhibit 25F, page 44). As noted in July 2021, the claimant denied any grand mal seizures since starting Keppra (Exhibit 28F, page 62). In September 2021, the claimant presented to the Mayo Clinic for further consultation and evaluation of multiple spells (Exhibit 28F, page 12). Progress notes show the claimant had a witnessed episode during an encounter and was admitted for spell classification and further tests. Dr. Ragland evaluated the claimant again for multiple spell types and noted there was no EEG medical findings to correlate to the claimant's spells (Exhibit 28F, page 15). Dr. Ragland recommended further neuropsychometric evaluation. While the record

shows the claimant has presented on multiple occasions to an emergency room and clinics for complaints of ongoing seizure activity, her treatment providers have not found medical evidence to establish a seizure disorder. **The claimant's reported "spells" and psychogenic seizures do not establish a medically determinable impairment without supporting objective medical evidence from an acceptable medical source in this record**.

(R. 18-19 (emphasis added).)

Defendant's argument with respect to the severity of the seizures is as follows:

To support her argument, Plaintiff relies on the evidence she submitted to the Appeals Council. Pl's Br. at 14. However, this evidence did not reveal a diagnosis of a seizure disorder, but rather behavioral spells (Tr. 43, 50, 57). The evidence showed that Plaintiff's low memory scores were likely due to multiple factors such as mood, sleep disturbance, fatigue, and medication; psychotherapy and developing a daily routine were recommended (Tr. 47). The evidence also showed she was still able to drive (Tr. 46). Thus, as discussed above, this evidence would not change the ALJ's finding that Plaintiff did not have a severe, medically determinable seizure disorder.

(Dkt. 16 at 10.)

In this regard, if the Appeals Council denies review without substantively considering newly submitted evidence, the reviewing court may remand the case where it relates to the period on or before the date of the administrative law judge hearing decision. 20 C.F.R. § 404.970(b); *see also* 20 C.F.R. § 416.1470. "The Appeals Council must consider evidence submitted with a request for review if it is '(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000) (quoting *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995)). "In order [t]o be 'new,' evidence must be more than merely cumulative of other evidence in the record." *Id.* "To be 'material,' the evidence must be relevant to claimant's condition for the time period for which benefits were denied. Thus, to qualify

as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition." *Id.* at 1069-70.  In addition, the Appeal Council will only review a case based on new evidence if it meets the aforementioned requirements and "there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 416.1470(a)(5); *see also Craig M. v. Berryhill*, No. 18-cv-908 (NEB/DTS), 2019 WL 2648029, at *2 (D. Minn. June 10, 2019), *R. & R. adopted by* 2019 WL 2644199 (D. Minn. June 26, 2019).  However, when the Appeals Council denies review of an ALJ's decision after reviewing newly submitted evidence, a reviewing court does not evaluate the Appeals Council's decision to deny review but rather examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision.  *See McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013).

Exactly how the Appeals Council applied the regulations is somewhat unclear.  The Appeals Council stated that "[w]e did not exhibit this evidence."  (R. 2.)  However, the Appeals Council found that the additional evidence did not show a reasonable probability that the outcome of the ALJ's decision would change.  (R. 2.)  To make such a determination, the Appeals Council would, necessarily, have needed to consider the additional evidence.  On this basis, the Court examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision.  *See Deanna T. v. Kijakazi*, No. 20-CV-576 (ECW), 2021 WL 3620172, at *23 (D. Minn. Aug. 16, 2021).

The argument by Defendant that there was no error at step two, because there was no diagnosed seizure disorder, ignores the determination by the neurologists at the Mayo Clinic regarding their diagnosis of Plaintiff's undifferentiated spells, which they characterized as "real" and "significant" in the record before the Appeals Council:

> Discussed EMU **monitoring results which demonstrated a normal EEG with severe recorded typical events without EEG correlate consistent with non-epileptic behavioral events.** We discussed the nature of non-epileptic attacks, one of the functional neurological symptom disorders. We discussed that these are involuntary and abrupt attacks that are impairing, and that they are commonly in the setting of specialty epilepsy evaluations. They are often misdiagnosed and treated as epilepsy for years before the correct diagnosis is made. This can leave people feeling understandably frustrated and confused. While these attacks mimic the seizures caused by epilepsy, the EEG during these attacks does not show an electrical seizure of the brain but instead looks like the patient's baseline EEG. **Although they are not electrical seizures, the attacks can be no less disabling, and can result in all of the same problems that epileptic seizures do including loss of independence and accidental injury. <u>What is most important to know is that these are not "fake." These are real, involuntary attacks that pose a significant problem.</u>**

> We discussed that the mechanisms behind these attacks are complex and not well understood. Some patients endorse significant life stressors as a potential cause, but many (if not most) do not identify any specific factors resulting in these events. Similarly, some patients may have backgrounds that include depression, anxiety, or PTSD, but again many patients do not have these factors as identified contributors. **Regardless, these attacks ultimately come about because of impairment between how the mind, brain, and body communicate with each other. Because they are not electrical seizures, anticonvulsant medications like those used in epilepsy are not helpful for treatment. The recommended treatment is through our mental health colleagues with therapies that aim to help realign the mind-brain-body communication that has gone awry**.

(R. 43 (emphases added).)

Further, the Commissioner does not dispute that the Mayo Clinic medical providers witnessed Plaintiff suffering from these non-epileptic "attacks" (also referred to

as behavioral spells (R. 49)), that these same providers believed that these spells could result in an accidental injury (R. 43). The Commissioner also does not dispute that the overall record supported that Plaintiff had suffered from the attacks during the period at issue necessitating medical attention, including at least two instances that resulted in her physical injury. (*See*, *e.g.,* 682, 685, 1240, 1377, 1420-35, 1700-04, 1752, 1880, 1891, 2082, 2159.) Further, this finding of behavioral spells is consistent with other neurologists' belief that Plaintiff may have been suffering from psychogenic nonepileptic seizures. (*See*, *e.g.*, R. 1700, 1704, 1757, 1800.)

## B.    Harmless Error

In *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), the plaintiff contended that she was disabled, in part, due to borderline intellectual functioning. *Id.* at 886. On appeal, the claimant "assert[ed] that the ALJ erred in failing to include her diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis." *Id.* at 887. Although the Commissioner in *Nicola* conceded that the plaintiff's borderline intellectual functioning should have been considered a severe impairment, the Commissioner argued that the ALJ's error was harmless. *Id.* The Court of Appeals for the Eighth Circuit "reject[ed] the Commissioner's argument of harmless error," noting that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Id.*

Courts have been split regarding whether an error at step two can be harmless. "Some Courts have interpreted *Nicola* to mean that an error at step two can never be harmless." *Lund v. Colvin*, No. 13-cv-113 JSM, 2014 WL 1153508, at *26 (D. Minn.

Mar. 21, 2014) (collecting cases); *see also Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe."). Other courts, including other courts in this District, have refused to interpret *Nicola* as establishing a *per se* rule that any error at step two is a reversible error. *See Lund*, 2014 WL 1153508, at *26 (collecting cases).

In the absence of clear direction from the Eighth Circuit, the prevailing view of courts in this District has been that an error at step two may be harmless where the ALJ considers all of the claimant's impairments, regardless of whether they were found severe or non-severe, in the evaluation of the claimant's RFC. *See, e.g.*, *Rosalind J. G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *20 (D. Minn. Mar. 27, 2019) ("Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual functional capacity."); *David G. v. Berryhill*, No. 17-cv-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); *Tresise v. Berryhill*, No. 16-cv-3814 (HB), 2018 WL 1141375, at *5 (D. Minn. Mar. 2, 2018) ("Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when the ALJ fails to consider the omitted impairments in the RFC."); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a

27

severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity.") (citation omitted). Here, the alleged error could be described as a failure to evaluate whether Plaintiff's pseudoseizures were severe (as compared to what appears to be the ALJ's evaluation of the severity of any **epileptic** seizures) or the incorrect determination that Plaintiff's seizures, regardless of whether their cause, did not constitute a severe impairment. However, the analysis is the same. *See Mistelle S. v. Saul*, No. 19-CV-01153 (SRN/HB), 2020 WL 3405437, at *4 (D. Minn. June 2, 2020) ("The same reasoning applies even if an ALJ fails to discuss whether certain impairments are severe or non-severe at the second step (which is the case here), as long as the limitations caused by these impairments are adequately assessed later in the process." (quotation marks and citation omitted)), *R.&R. adopted*, 2020 WL 3402432 (D. Minn. June 19, 2020); *Misty G. v. Berryhill*, No. 0:18-cv-00587-KMM, 2019 WL 1318355, at *4 (D. Minn. Mar. 22, 2019) (same). Such a finding is consistent with the Commissioner's regulations. *See* 20 C.F.R. § 404.1545(a)(1)-(2) (an ALJ must consider all relevant evidence, including non-severe impairments, in the RFC determination); 20 C.F.R. § 416.945(a)(1)-(2).

Here, the ALJ did consider Plaintiff's spells in formulating the RFC, which often would result in a finding of harmless error at step two. *See Vicky R. v. Saul*, No. 19-CV-2530 (ADM/ECW), 2021 WL 536297, at *11 (D. Minn. Jan. 28, 2021), *R. & R. adopted sub nom.*, 2021 WL 533685 (D. Minn. Feb. 12, 2021); *Michael T. B. v. Kijakazi*, No. 20-CV-1779 (WMW/ECW), 2021 WL 7082736, at *13 (D. Minn. Dec. 3, 2021), *R. & R.*

*adopted*, 2022 WL 507389 (D. Minn. Feb. 18, 2022) ("Because the record is clear that the ALJ considered Plaintiff's bilateral knees and left shoulder when formulating the RFC at step four, any potential error at step two from the ALJ's failure to specifically identify those joints as suffering from severe impairment was harmless.").  Specifically, the ALJ considered the seizures or spells as part of her RFC analysis:

> The alleged frequency of seizures or "spells" is inconsistent with progress notes from a clinic visit in February 2021 that document the claimant reported her last seizure occurred in September 2020, suggesting she was seizure free for approximately five months (Exhibit 26F, page 44). The alleged seizures are inconsistent also with the claimant's testimony she still drives, even after a witnessed seizure in September 2021 (Exhibit 28F). The undersigned has considered the effects of this "neurological spell" by limiting the claimant's exposure to hazards and no commercial driving, but the diagnosis remains unclear.

(R. 25.)  Indeed, not only did the ALJ consider the seizures, regardless of their etiology, the ALJ ultimately included a limitation of "no exposure to unprotected heights or dangerous equipment, and no driving as part of the job" in the RFC.  (R. 23.)

However, Plaintiff has also challenged the RFC, which the Court addresses below.

## C.    Whether the RFC is Supported by Substantial Evidence

A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no

requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20) (citations omitted).

As set forth previously, the ALJ found that Plaintiff had the following RFC:

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and occasionally push or pull within the limitations in lifting and carrying. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance (as the term is defined in SCO), stoop, kneel, crouch, and crawl. The claimant is limited to occasional overhead reaching. The claimant is limited to occasional exposure to extreme cold, wetness, and vibration. The claimant would need to avoid working in environments where she is exposed to loud or very loud background noise (as the term is defined in SCO). The claimant is limited to no exposure to unprotected heights or dangerous equipment, and no driving as part of the job. The claimant is able to understand, remember, and carry out with acceptable pace and persistence simple, routine tasks in a routine work environment (simple are those that can be learned in 30 days). The claimant is able to adapt to changes in a routine work setting and follow employer set goals. The claimant can work at a goal orientated pace throughout the workday but not at a production rate pace in an industrial setting where tasks must be completed within very short time deadlines.

(R. 23.)

Plaintiff argues that the RFC is not supported by substantial evidence for the following reasons:

> Throughout the period at issue, [Plaintiff] experienced episodes that mimic more traditional epileptic seizures, at variable frequency – as often as multiple times per day during certain periods, but reduced to monthly at others. These episodes were unpredictable, and could result in physical injuries requiring medical care if [Plaintiff] injured herself in a fall. No limitations in [Plaintiff's] RFC address the unpredictable, sporadic nature of these incidents, which multiple vocational experts confirmed would limit or impair [Plaintiff's] ability to find and maintain competitive employment. It was error not to account for the increased absenteeism and off-task time this severe impairment would require.

(Dkt. 13 at 15.)

The Commissioner counters that the ALJ took Plaintiff's seizures into account (as noted above) and that the additional limitations regarding absenteeism and off-task time were inconsistent with her activities such as driving, walking up and down stairs frequently, cleaning, and doing laundry; with the treatment notes in February 2021 documenting that she had been seizure free for 5 months; and based on evidence of a big improvement in her seizures after Plaintiff started taking Keppra. (Dkt. 16 at 12.)

As a starting point, the Court notes that while Plaintiff's daily activities are relevant when determining an RFC, the Eighth Circuit has held that a person's ability to engage in personal activities such as cooking, cleaning, or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity. *See Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). Further, it is well-settled that "a claimant need not prove she is bedridden or completely helpless to be found disabled." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations

omitted).  In addition, the ALJ's decision cannot be sustained on the basis of post-hoc

rationalizations of appellate counsel.  *See Stacey S. v. Saul*, No. 18-cv-3358 (ADM/TNL),

2020 WL 2441430, at *15 (D. Minn. Jan. 30, 2020), *R. & R. adopted*, 2020 WL 1271163

(D. Minn. Mar. 17, 2020).  "It is not the role of this Court to speculate on the reasons that

might have supported the ALJ's decision or supply a reasoned basis for that decision that

the ALJ never gave."  *Id.* (collecting cases).  The Court acknowledges that the ALJ relies

on the chores and exercises (going up and down the stairs) referenced by Plaintiff in a

February 2021 treatment note, but only addressed these with respect to her claims of a

"total incapacity due to 'bad days' of increased symptoms of chronic headaches and

pain" and not with respect to her claims of spells or seizures.  (R. 25.)  Even assuming

that the Court could consider this argument, the record relied upon by the Commissioner

contains an important caveat to these activities:

> Her exercise habits include: states she has to pace herself, she goes up and
> down stairs frequently. She does clean and does laundry. She notes the
> "**faster my heart rate goes the more I need to sit otherwise I get a
> pseudo seizure**."

(R. 2135 (emphasis added).)  In other words, according to this record, those activities can

affect her spells.  Further, while the ALJ noted that Plaintiff drove even after one of her

witnessed seizures in September 2021, she nevertheless limited her RFC to no driving in

light of those spells.  (R. 25.)

Similarly, the Court cannot consider the Commissioner's post-hoc arguments with

respect to the RFC regarding the Plaintiff's improvement on Keppra, as that drug is

intended to treat epileptic seizures, and the ALJ found that the record did not support that

Plaintiff was suffering any epileptic seizures.  (R. 19 ("Neurology noted the claimant did not require increased dosing of Keppra, as her symptoms were likely nonepileptic seizures.").)  Similarly, the new documents provided to the Appeals Council from the Mayo Clinic contradict the Commissioner's reliance on Plaintiff's improvement when taking Keppra, as the documents show that providers "offered the patient to take her off Keppra given that her spells were shown to be non-epileptic in nature. . . ."  (R. 43.)

The Commissioner is correct that, based on the available record as of February 2021, the ALJ correctly concluded that Plaintiff had been seizure free for 5 months. However, this argument asks the Court to ignore the 2 years of continued seizure activity between September 2018 and September 2020, and seizure activity starting up again in April 2021 through the end of November 2021, as documented by the Mayo Clinic, including documentation that has not been considered by the ALJ.  *See* 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

Further, while the Commissioner points to the fact that the ALJ put in place limitations with respect to the seizures and spells, there is no indication whether the ALJ considered whether the spells would cause her to miss work or be off-task while at work. Indeed, as noted by at least one court, the fact that the ALJ put in place limitations with respect to the spells or seizures necessarily assumes that Plaintiff could have such spells while at work:

> That evidence is enough to require the ALJ to consider whether Plaintiff would be off task when he experienced a seizure at work, and if so for what amount of time. *See Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir.

2022) ("Essentially, an ALJ's RFC analysis must say enough to enable review of whether the ALJ considered the totality of a claimant's limitations."). But she did not do so, despite identifying Plaintiff's seizure disorder as a "severe impairment" that "significantly limit[s] the ability to perform basic work activities." Dkt. 9-2 at 14. Moreover, the ALJ imposed other restrictions—like avoiding ladders, ropes, scaffolds, unprotected heights, and moving mechanical parts—to "protect against danger to himself and others in the event he experiences a seizure." Id. at 17. Since those restrictions assume that Plaintiff would have seizures at work, the ALJ should have also considered whether experiencing a seizure would result in time off task and if so, for how long. *See Mandrell v. Kijakazi*, 25 F.4th 514, 519 (7th Cir. 2022) ("Just as troublesome is the ALJ's failure to reconcile his own apparently contradictory findings."); *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (holding that case must be remanded to the ALJ because "there was no restriction related to stress in the RFC" despite evidence that Plaintiff "often appeared tense, anxious, and/or restless").

*Alexander S. L. v. Kijakazi*, No. 2:22-cv-00031 (JPH/MKK), 2023 WL 2705587, at *3 (S.D. Ind. Mar. 30, 2023). Here, as noted previously, the ALJ concluded that the seizure diagnosis was unclear, but nevertheless limited Plaintiff's exposure to hazards and no commercial driving. (R. 23, 25.) Similar to *Alexander S.L.*, *supra*, because these restrictions assume that Plaintiff would have seizures at work, the ALJ should have also considered whether experiencing a spell would result in either time off work or time off task and if so, for how long.

* * *

Under all of these circumstances, the Court concludes that this case should be remanded back to the ALJ to address errors with respect to step two and the RFC, and to recall a vocational expert for testimony to the extent necessary to address a new hypothetical based on a modified RFC.[6]

---

[6]    On remand, the ALJ should also consider at step three whether the spells identified

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT**:

1.    Plaintiff Angela K.'s Motion for Summary Judgment (Dkt. 12) be

**GRANTED IN PART**;

2.    Defendant's Motion for Summary Judgment (Dkt. 15) be **DENIED**; and

3.    This case be **REMANDED** to the Commissioner pursuant to sentence four

of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report

and Recommendation.

DATED: July 20, 2023                          *s/Elizabeth Cowan Wright*
                                              ELIZABETH COWAN WRIGHT
                                              United States Magistrate Judge

---

as part of step two meet or equal the severity of any of the impairments listed in 20
C.F.R. part 404, subpart P, appendix 1 (as raised by Plaintiff (Dkt. 13 at 16)) if
appropriate. *See Louise W. v. Berryhill*, No. 17-CV-4973-SRN-KMM, 2019 WL 404038,
at *6 (D. Minn. Jan. 28, 2019), *R. & R. adopted*, 2019 WL 409384 (D. Minn. Jan. 31,
2019); *see also Misty G.*, 2019 WL 1318355, at *5 ("The ALJ then went on to consider
whether Ms. G's mental-health impairments, either individually or combined, meet or
medically equal any of the Listings, and he eventually evaluated her RFC.  Based on the
ALJ's discussion of Ms. G's mental-health symptoms and the resulting functional
limitations, and having reviewed the record as a whole, the Court concludes that any error
committed by the ALJ at step two is harmless."). The Court notes that the
Commissioner's regulations provide, that "pseudoseizures are not epileptic seizures for
the purpose of 11.02.  [The Commissioner] evaluate[s] **psychogenic seizures** and
pseudoseizures under the mental disorders body system, 12.00."  20 C.F.R. Pt. 404, Subp.
P, App. 1, Sec. 11.00H (emphasis added).

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).